UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BUILDINGREPORTS.COM, INC., a
Georgia corporation;

          Plaintiff.

   v.

HONEYWELL INTERNATIONAL, INC.,
a Delaware corporation;

          Defendant.

**CASE NO. 1:17-cv-03140-SCJ**

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff BuildingReports.com, Inc. ("BRC"), by and through

its undersigned counsel, and files this Second Amended Complaint for Damages

against Defendant Honeywell International, Inc. ("Honeywell"), alleging as follows:

## INTRODUCTION

1.     Since 1999, BRC has been an industry leader in the fire safety

compliance reporting industry. Honeywell sought to enter this market with a

competing program, called "eVance Services".  This lawsuit arises out of

Honeywell's attempts to mimic BRC's successful business model and develop this

new, competing business line using improper means, including hacking into BRC's

computer system without authorization, scraping BRC's website to obtain BRC's

customer list, intentionally damaging BRC's computer system in the process, recruiting BRC's employees and inducing them to breach their confidentiality agreements, and then using the fruits of these labors to solicit BRC's clients.

2.      Honeywell's pattern of illicit conduct gives rise to various claims including: violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 *et seq.* (Count I); violation of the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-90, *et seq.* (Count II); tortious interference with employment covenant (Count III); attorneys' fees and expenses of litigation, O.C.G.A. § 13-6-11 (Count IV); and punitive damages, O.C.G.A. § 51-12-5.1 (Count V).

## THE PARTIES

3.      BRC is a Georgia corporation in the business of providing online and mobile inspection software and tools, which aide commercial facilities in compliance reporting.  Building Report's principal place of business is 1325 Satellite Blvd, Building 1600, Suite 1607, Suwanee, Georgia, 30024.

4.      Honeywell International, Inc. ("Honeywell") is a Delaware corporation with its principal place of business at 115 Tabor Road, Morris Plains, NJ, 07950. Honeywell may be served with process through its registered agent, Corporation Service Company, 40 Technology Parkway South, Suite 300, Ben Hill, Norcross, Georgia, 30092.

5.     Honeywell is a multi-national conglomerate with business segments or divisions including, as relevant to this litigation: NOTIFIER, a manufacturer of engineered fire alarm systems; Honeywell Fire Systems; Honeywell Fire Safety; Honeywell Life Safety; Honeywell Security and Fire; Gamewell-FCI, part of Honeywell Security and Fire; and Silent Knight, also part of Honeywell Security and Fire.

## JURISDICTION AND VENUE

6.     This action arises under the common law and various federal and state statutes.

7.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  BRC is incorporated in Georgia and has its principal place of business in Georgia.  Honeywell is incorporated in Delaware and has its principal place of business in New Jersey.  As such, complete diversity exists between the parties pursuant to § 1332(c)(1).  Furthermore, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Personal jurisdiction exists over Honeywell under Georgia's long-arm statute, O.C.G.A. § 9-10-91, because Honeywell: regularly transacts business in Georgia, including offering products and services to residents of Georgia arising out of the tortious conduct alleged in this Complaint; has committed tortious acts directed

to BRC in Georgia, resulting in tortious injury to BRC, the harmful effects of which have been felt in Georgia; regularly does and solicits business, engages in other persistent course of conduct and derives substantial revenue from goods used or consumed or services rendered in Georgia; and/or owns, uses or possesses real property in Georgia.  Additionally, the exercise of jurisdiction over Honeywell by this Court does not offend traditional fairness and substantial justice in light of Honeywell's systematic and continuous contacts with Georgia, including operating out of an office within this Judicial District, at 715 Peachtree Street NE, Atlanta, GA 30308, such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

9.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1). Honeywell "resides" in this judicial district for purposes of 28 U.S.C. § 1391(c)(2), as it is subject to this Court's personal jurisdiction in this judicial district for purposes of this action, based on its regular transaction of business in this judicial district and substantial revenues from activities within this judicial district, its tortious activity directed at a resident of this judicial district with resulting injurious effects felt by such resident in this judicial district, the substantial revenue it has derived from goods used or consumed or services rendered in this judicial district, and its systematic and continuous contacts with this judicial district.

4

## THE CONTROVERSY

**I.**      **BRC's Inspection Compliance Services and Products.**

10.     Building fire and safety inspection is historically a complex, time-consuming task in light of the widely varying inspection categories, including local business and fire codes, OSHA, NFPA, federal and other standards organizations.

11.     Formed in 2000, BRC is a leader in the business of providing building safety compliance and online inspection reporting solutions for each building inspection category.

12.     BRC provides online inspection tools to a broad network of service providers, building owners, property managers and fire and safety officials.  BRC's member network includes more than 800 inspection company locations, and BRC's solutions have been used to inspect more than 250 million devices with more than 600,000 buildings represented, with a total of 3.7 million inspections to date.

13.     BRC's tools improve the building safety inspection process, resulting in lower inspection costs and significantly reduced compliance risk for BRC's clients.  For example, BRC's mobile scanning software allows BRC's clients to collect inspection data during fire alarm, extinguisher, Clean Agent Suppression, life safety, security or sprinkler system inspections, eliminating the need for outdated, cumbersome paper reports.

5

14.     BRC also provides service member clients with secured and customized web portals (the "Portal"), which give the companies controlled access to inspection reports and tools through use of a unique login ID and password.  The Portal provides online report database and management tools enabling service members to properly inspect and maintain safety devices in buildings they serve.

## II.   Honeywell Began Questioning BRC's Customers Regarding BRC's Tools and Solutions.

15.     In late 2011, BRC learned that Honeywell was looking to develop a product under its NOTIFIER brand to compete with BRC's inspection report solutions.

16.     Specifically, multiple contacts reported to BRC that during an industry conference in October 2011 (the HLS Annual Distributors Conference), Honeywell executives surveyed attendees regarding "Software as a Service", including asking attendees to identify which company they use for acceptance testing.

17.     On January 13, 2012, Honeywell Life Safety's Network Product Manager John Terrell emailed a BRC customer (and NOTIFIER distributor) based on that client's identification of BRC for the customer's acceptance testing solutions.  Mr. Terrell advised the client in an email:

NOTIFIER is interested in doing further research into acceptance testing and how you utilize BuildingReports in this process.

NOTIFIER would like to question your Inspectors about BuildingReports while they are performing acceptance testing on site or installing and setting up BuildingReports and testing for the first time.  Our team only seeks to understand the task of setting up and utilizing BuildingReports during acceptance testing.  We would like to take notes so we can learn how to develop a better product.  Any information obtained will be kept confidential and shared only with NOTIFIER's Marketing and Engineering staff.

We hope that you are able to participate in this venture with NOTIFIER.

18.     Mr. Terrell's email suggested to BRC's customer that a venture existed between BRC and Honeywell.  No such joint venture has ever existed.

19.     Similarly, in February 2012, another BRC customer (and NOTIFIER distributor) informed BRC that during a meeting with two NOTIFIER employees the customer had been questioned heavily regarding BRC's services.

20.     The customer informed BRC that during the meeting with NOTIFIER he, too, had been led to believe that NOTIFIER was working on a venture directly with BRC.

**III.   Honeywell Accesses BRC's Web Portal.**

21.     Without authorization from BRC, as early as February 2012, Honeywell accessed BRC's Web Portal to download copies of certain inspection reports.  The activity described below was unknown to BRC at the time.

7

22.     Without authorization from BRC, Honeywell and Honeywell Life Safety ("HLS") obtained user accounts to access the Portal.

23.     On February 27, 2012, an employee of a BRC customer with Portal access created two BRC user accounts for Honeywell and HLS: (1) user ID "JTerrell1", for John Terrell, then a HLS Strategic Product Manager; and (2) user ID "BTeta", for Bob Teta, then a Director at Honeywell.

24.     That same day, the user ID BTeta and associated password were used to log into BRC three times through a Honeywell IP address, 199.61.25.254.  While logged into the BRC Portal using the newly-created BTeta user ID, and without authorization from BRC, copies of a number of BRC inspection reports were generated, including four SprinklerScan reports, two FireScan reports, and one SecurityScan report.

25.     Two days later, on February 29, 2012, the same user ID, BTeta, was used to log into BRC via the same Honeywell IP address.  This time, three HTML copies of a single inspection report were generated, which were previously generated on February 27.

26.     Two days later, on March 2, 2012, the same user ID, BTeta, logged into BRC via the same Honeywell IP address.  This time, a combination of HTML

and Word document downloads of four FireScan reports, four SprinklerScan reports, six ExtinguisherScan reports and two SecurityScan reports were generated.

27.     Mr. Teta admits to accessing BRC's website and printing at least one report.

28.     Around the same time it was accessing BRC's system without authorization, HLS and Honeywell Fire Systems / Honeywell Fire Safety ("HFS") were also attempting to obtain information directly from BRC.  For example, in May 2012, HLS's Vice President of Business Operations, John Chetelat, and HFS's Vice President of Strategic Marketing, Jamir Jain, submitted requests through BRC's website for information regarding BRC's CRM and ManagerSeries applications.

29.     Additionally, in June 2012, Mr. Jain visited BRC's trade-show booth during a conference, requesting to meet with BRC's Vice President of Sales & Marketing.  And in June 2012, a Honeywell Marketing Director reached out to BRC's CEO, Brett Brewster.

**IV.     Honeywell Develops Competing Web-Based Inspection Solution.**

30.     In August 2013, BRC learned that Honeywell was intent upon creating a competing web-based inspection system.

31.     Specifically, a BRC customer informed BRC that the President of HFS, Americas (Todd Rief) and President of HLS, Americas (Gary Lederer) told the customer that Honeywell was developing the inspection system, and asked the customer if it would switch from BRC to Honeywell when the system was completed.

32.     At the same time, Honeywell approached at least one BRC employee regarding a sales account manager position related to a "new offering Honeywell Fire Systems is developing."

33.     This new offering was formally introduced by Honeywell in June of 2014 in a press release, attached hereto as **Exhibit A**.

## V.     Honeywell Scrapes BRC's Customer List, Causing Damage to BRC's Computer System.

34.     To facilitate its business services, BRC maintains a tangible list of the hundreds of members which are its actual customers, including a list of each customer's name, and address information.  (the "Customer List").

35.     BRC maintains this Customer List in electronic form, with additional identifying information such as each customer's phone number and BRC's individual contact within the company.  This version of the Customer List is accessible only to BRC and its employees with authorized access to BRC's CRM software program.  The Customer List is not publicly available.

36.     Since its creation, and as both BRC and the Customer List have grown over the years, BRC has taken significant measures to ensure that this Customer List is not accessible to the public, but instead is accessible only to current BRC employees.

37.     BRC's reasonable precautions to prevent third parties from accessing the Customer List include: (1) maintaining the Customer List in protected CRM software and in electronic databases which are accessible using credentials BRC provides to its employees; (2) requiring each BRC employee to enter into Confidentiality Agreements which explicitly prevent employees from disclosing BRC's customer list to any third party without BRC's consent; (3) requiring any BRC vendor with potential access to the Customer List (including, for example, BRC's software vendor) to execute a Non-Disclosure Agreement which explicitly prevents the vendor from using or disseminating BRC's confidential information.

38.     As a result of these reasonable efforts to maintain the secrecy of the Customer List, BRC's Customer List is not now, nor has it ever been, known by or available to the public.  Instead, the Customer List is only known to authorized BRC employees and vendors.

39.     BRC developed its customer relationships – including the contacts identified in the Customer List – over a number of years.  By keeping the list

containing the identity of its hundreds of customers a secret from its competitors,

BRC maintains a competitive advantage in the fire safety compliance reporting

industry.  As such, the Customer List and/or large portions of the customer list

derives economic value from being secret from the public.

40.     As of September 8, 2014, BRC provided a Member Locator search

function on its website, www.buildingreports.com.  *See* **Exhibit B**, Screenshot of

Member Locator feature.  The Member Locator allows building owners a limited

ability to look up BRC customer service companies in their area, either by city or

zip code.

41.     BRC designed the Member Locator feature to enable the public to

search only a very limited region, up to 100 miles from a given city or zip code.  A

third party cannot run a search for all BRC customers across the country, nor can it

run a search for all BRC customers in a given state.  In short, the Member Locator

does not afford the public any reasonable ability to access the Customer List

residing in one or more electronic databases.

42.     In fact, the Member Locator tool's 100 mile radius search restriction

is an additional reasonable safeguard taken by BRC to protect the public from

discerning or accessing BRC's Customer List.  Specifically, a third party seeking to

uncover the identity of BRC's hundreds of customers would have to systematically

12

search either every single zip code in the United States (in excess of 40,000 zip codes), or thousands of cities throughout the United States.  The time that these searching methods would take are so prohibitive that it is reasonable for BRC to make its search tool available without concern for the disclosure of its Customer List.  Using proper means, no third party can or would ever discover BRC's Customer List.

43.     Although the Member Locator tool permits third parties to search for BRC customers within a narrow radius of a given city or zip code, the tool does not permit a third party to obtain BRC's Customer List.  The identity of a minute fraction of BRC's customers may be publicly-available and ascertainable to a member of the public using the Member Locator tool to search in his or her area, but there are no proper means by which the Customer List − or even substantial portions of such Customer List – can be ascertained by the public.

44.     Seven days after launching the Member Locator feature, on September 15, 2014, Honeywell began to systematically "scrape" BRC's Member Locator server in order to obtain the comprehensive BRC Customer List.

45.     Specifically, Honeywell began to actively develop, test and run a software tool with the intent to steal the names of all of the BRC's customers identified in the Customer List using the "Find Service Companies" page on the

BRC website via an application program interface, or API.  Honeywell proceeded to scrape BRC's Customer List from an electronic database accessible to the BRC web server by using an automated brute force inquiry of zip codes starting with 00001 and automatically logging all customer identities which appeared in response to these queries, without regard to the confidential nature of the aggregate list of said customers, or the detrimental impact the scraping tool would cause to the BRC server running the Member Locator feature.  Honeywell used an automated software tool to orchestrate this brute force search because it would take too much time and effort to have a person sit at their computer screen and enter each zip code manually, and then log the results of each search manually.

46.     Upon information and belief, Honeywell, acting through its employees, had knowledge of data scraping as a technique, and the general undesirability of that technique when applied to computer systems because of their tendency to (a) obstruct, interrupt and interfere with both computer programs and data associated with those programs; and (b) alter, damage and cause the malfunction of computer networks and computer programs.  To protect itself from these adverse consequences, Honeywell itself has one or more agreements which require persons dealing with Honeywell to avoid the use of scraping tools.

14

47.     Upon information and belief, Honeywell knew that use of this scraping tool would preoccupy the BRC web server running the Member Locator feature, so as to interrupt and stop the program's ability to be used by other members of the public, thereby also knowingly interfering with and so as to overload the BRC web server, compromising the server's functionality (including its ability to process BRC's other web site traffic), resulting in interference with and the (at least temporary) malfunction of BRC's web site.

48.     Mr. Teta admits to running manual searches of numerous zip codes using BRC's Member Locator feature. Likewise, Richard Fischer and Jeff Netland, also Honeywell employees, were on a conference call with Mr. Teta at the time Mr. Teta was running manual searches of zip codes in BRC's Member Locator, and were also running their own searches at the same time.

49.     A subsequent review of BRC site logs show that the same Honeywell IP address used by the BTeta user ID to access and download copyrighted forms from BRC in 2012 (199.61.25.254) began to test the BRC Member Locator feature on September 15, 2014 at 7:12 p.m.  Thus, upon information and belief, one or more Honeywell employees began testing the BRC Member Locator feature with a view towards scraping BRC's Customer List from the BRC server.  The Honeywell

user first searched the zip code "00001" as a test, and continued with systematic testing of zip codes.

50.    Within an hour, the BRC site logs reflects that the Honeywell user developed and tested the aforesaid scraping tool.  Evidence of this development and testing includes the increased frequency of the Honeywell user's searches, while at the same time manually testing specific zip codes.  For example, the Honeywell user searched all zip codes from "10000" to "10015" in increments in approximately 30 seconds, followed by a search of zip codes between "10000" and "11558" in approximately 10 minutes, and a manual test of zip code "55318" in Carver County, Minnesota.

51.    The BRC site logs reflect additional efforts by the Honeywell user to map and log data results from the API on September 15, 2014, as well as multi-threading tests to increase the frequency of searches.

52.    At approximately 11:45 p.m., the Honeywell user switched from the Honeywell IP address to a Comcast IP address, 75.72.123.0, and frequent searches continued until approximately 6 a.m. on September 16, 2014.

53.    The Comcast IP address 75.72.123.0 maps to Minnesota. At this time, Honeywell maintained an office in Minnesota, and at least one eVance team member worked from that office.

54.     That same day between 2 p.m. and 10:15 p.m., the Honeywell IP address was used once again to continuously search zip codes for BRC customers.

55.     At that time, BRC received an email from its server hosting provider notifying BRC that its marketing servers had exceeded their allotted CPU usage over the previous two hours.  Furthermore, during the time in which the Honeywell user was using the software tool to run these brute force searches of the Member Locator feature, the server's ability to service legitimate customers and prospective customers on the BRC web site slowed down significantly, resulting in customer complaints to BRC about the functionality of its web site.  Additionally, two of BRC's employees were forced to expend substantial efforts as a direct result of Honeywell's trespass, including blocking the Honeywell user from accessing the server, additional monitoring of the server to ensure the Honeywell user was not able to access the server, and placing a detector on the server.

56.     Moreover, as an additional result of Honeywell's efforts to scrape the Member Locator feature with brute force searches of multiple zip codes, upon information and belief, Honeywell was able to compile its own list of BRC customers − a list which is not otherwise readily ascertainable to the public even if the Member Locator feature is used for its intended purposes.  Upon information and belief, Honeywell obtained at least 72% of the contents of BRC's Customer

List –and identifying information relating to hundreds of BRC customers from all over the U.S. -- prior to being stopped.

57.     Upon information and belief, Honeywell subsequently used the contents of the scraped Customer List improperly in an effort to obtain a competitive advantage over BRC.

58.     Subsequently, BRC has expended time and resources investigating the unlawful intrusion into its computer system by an unauthorized third party, resulting in actions by BRC that have blocked the two IP addresses identified above from accessing the Member Locator feature of its web site.

## VI.     Honeywell Interferes with BRC's Employee Confidentiality Agreement

59.     On November 16, 2016, a Honeywell recruiter approached all BRC sales and account management staff with a LinkedIn profile regarding employment with HFS' "new business for the Software & Services Team."

60.     Each BRC employee (including those solicited by Honeywell) has signed restrictive covenants restricting such employee(s) from disclosing BRC's confidential information, whereby the employee agrees: to hold all of BRC's confidential, proprietary and trade secret information in trust and confidence; not to use such information for any purpose not authorized by BRC; and not to disclose

such information to any third party without BRC's written consent, until such time as the information becomes common knowledge within the industry.

61.     O.C.G.A. § 13-8-53(e) states that "Nothing in this article shall be construed to limit the period of time for which a party may agree to maintain information as confidential or as a trade secret . . . **for so long as the information or material remains confidential** or a trade secret, as applicable." BRC's confidentiality agreement is consistent with this statute and allows the confidential material to remain confidential "until such time as the information becomes common knowledge within the industry." Accordingly, BRC's confidentiality agreement is enforceable. (Emphasis added).

62.     BRC requires its employees sign this confidentiality agreement to protect its legitimate business interests, including its confidential, proprietary and trade secret information.

63.     The terms of this confidentiality agreement are enforceable and binding on each BRC employee.

64.     At least as of July 12, 2017, Honeywell knew that BRC's employees, including a former BRC employee named Jeff Montoney, had signed this confidentiality agreement.  Honeywell knew this because on or about July 12, 2017, Mr. Montoney emailed Honeywell managers disclosing this information.

65.     On or about August 7, 2017, Honeywell induced breach of Mr. Montoney's confidentiality covenant: a Honeywell product manager Tayrn McCarthy asked Mr. Montoney to disclose to it, in writing, BRC's confidential pricing information.  Mr. Montoney felt "uncomfortable" doing this, and asked that this information not be disclosed "publicly."  Regardless, Mr. Montoney provided this confidential information to Ms. McCarthy via e-mail on or about August 7, 2017.

66.     Similarly, while employed with Honeywell, Mr. Montoney also provided BRC's confidential pricing information to Summit Technologies, a distributor with whom Mr. Montoney was working at Honeywell, that was attempting to sell Honeywell's competing (with BRC) eVance services to BRC's customer, St. Cloud Hospital.

67.     Honeywell's intent in inducing the breach of this restrictive covenant was to harm BRC (via release of confidential information, etc.) while artificially propping up its eVance business.

68.     Honeywell purposefully encouraged and induced Mr. Montoney to breach the terms of his confidentiality agreement, with knowledge of such terms and with the specific intent not only to improve Honeywell's business, but also to cause specific, lasting and permanent damage to BRC's business.

20

<u>**COUNT I**</u>
**Violation of the Georgia Trade Secrets Act**
**(O.C.G.A. § 10-1-760 *et seq.*)**

69.     BRC incorporates by reference Paragraphs 34-58 of the Second

Amended Complaint.

70.     As detailed above, BRC's Customer List is a tangible list of BRC's

actual customers, which BRC maintains in electronic form on its secure computer

server.

71.     The Customer List is not accessible to the public, but instead is only

accessible to BRC's authorized and credentialed employees only after execution of

appropriate Confidentiality and/or Non-Disclosure Agreements preventing the

disclosure and unauthorized use of the Customer List.

72.     As such, the Customer List is not commonly known by or available to

the public through lawful means.

73.     Pursuant to its terms of use, BRC allows the public to search the

Member Locator for customers in a limited area, such as in a given city or zip code.

This is not the same as allowing the public to access the Customer List.  In fact, BRC

explicitly designed the Member Locator in a manner so that the public cannot access

any significant portion of the Customer List.  Based on BRC's design of the Member

Locator, the Customer List (and large segments of such list) are not readily ascertainable by proper means by the public.

74.     BRC derives economic value, actual or potential, from the Customer List not generally being known to and not readily being ascertainable by proper means to other persons who could obtain economic value from its disclosure or use. Specifically, BRC obtains a unique competitive advantage by having the identity of its hundreds of customers, their addresses and specific points of contact within each customer unknown to the public.

75.     As described above, the Customer List is the subject of efforts by BRC that are reasonable under the circumstances to maintain its secrecy.

76.     Thus, the Customer List constitutes a "trade secret" as defined by the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-761(4).

77.     Honeywell knew or had reason to know that, by scraping BRC's Customer List from the private electronic database where it resided, it was acquiring BRC's trade secret by improper means going far beyond the use of the Member Locator feature to search for BRC customers in a person's geographic area.

78.     Honeywell has proceeded to use the contents of the Customer List that it obtained by improper means without express or implied consent.

79.     In doing so, Honeywell wrongfully engaged in the electronic misappropriation of BRC's trade secrets in violation of O.C.G.A. § 10-1-761(2)(A) and (B).

80.     Honeywell's misappropriation of BRC's trade secrets was willful, malicious, and intentional. On information and belief, it has caused, and will continue to cause, significant and substantial harm to BRC, including but not limited to lost profits and damage to BRC's standing in the marketplace.

81.     As a result of Honeywell's willful and malicious misappropriation of BRC's trade secrets, BRC is entitled to an injunction to prevent the actual and/or threatened misappropriation of its trade secrets, as well as monetary damages pursuant to O.C.G.A. §§ 10-1-762 and 10-1-763.

82.     In addition, because Honeywell's actions in misappropriating BRC's trade secrets were willful and malicious, BRC is entitled to exemplary damages and its reasonable attorneys' fees, pursuant to O.C.G.A. §§ 10-1-763 and 10-1-764.

**COUNT II**
**Georgia Computer Systems Protection Act – Computer Trespass**
**O.C.G.A. § 16-9-90, *et seq.***

83.     BRC incorporates by reference Paragraphs 40-55 and 58 of the Second Amended Complaint.

84.     As described above, Honeywell violated the provisions of the Georgia Computer Systems Protection Act ("GCSPA") by committing Computer Trespass pursuant to O.C.G.A. § 16-9-93(b)(2) and (3).

85.     Specifically, Honeywell utilized a scraping tool to access BRC's web servers and the databases accessible to them, with the knowledge and intent that the use of such scraping tool would interrupt and interfere with the use of BRC's computer programs and data, namely, BRC's web site.  In doing so, Honeywell violated O.C.G.A. § 16-9-93(b)(2).

86.     Additionally, these actions were done with the knowledge and intent that they would, at a minimum, alter and damage BRC's computer programs and data, namely, BRC's web site, BRC's Member Locator tool and data residing in one or more electronic databases accessible thereto.  In doing so, Honeywell violated O.C.G.A. § 16-9-93(b)(3).

87.     The actions complained of herein were done with Honeywell's knowledge that such conduct was without BRC's express or implied authority.

88.     As detailed in the foregoing paragraphs, Honeywell used a computer or computer network with knowledge that such use was without authority and with the intention of obstructing, interrupting and interfering with the use of BRC's web site, including its Member Locator program, and further altering, damaging and causing

the malfunction of the web servers operating the BRC web site, including the Member Locator program.  By reason of Honeywell's violations of the provisions of O.C.G.A. § 16-9-93(b)(2) and (3), BRC has been injured and suffered damages.

89.     BRC is entitled to recover the direct and consequential damages sustained as a result of Honeywell's computer trespass. As detailed above, these damages include, but are not limited to, reimbursement of the time and resources expended investigating Honeywell's trespass and damages resulting from the disruption to BRC's web site, in an amount to be determined at trial.

90.     Additionally, BRC is entitled to attorneys' fees and costs of this action, pursuant to O.C.G.A. § 16-9-93(g)(1).

## COUNT III

### Tortious Interference with Employment Covenant

91.     BRC incorporates by reference Paragraphs 59-68 of the Second Amended Complaint.

92.     Until February 2017, Mr. Montoney was in an employment relationship with BRC and subject to the above-described confidentiality agreement.

93.     Honeywell was a stranger to the confidentiality agreement between BRC and Mr. Montoney.

25

94.     Honeywell interfered with the confidentiality agreement between Mr. Montoney and BRC by inducing Mr. Montoney to violate his confidentiality agreement, all while Honeywell had knowledge of this agreement.

95.     Honeywell's interference was done with the intent that Mr. Montoney breach his confidentiality agreement.  Additionally, this was done with the intent to benefit Honeywell and to damage BRC by misappropriating at least the confidential pricing information that BRC had developed during the course of its business.

96.     Honeywell's wrongful interference resulted in the breach of Mr. Montoney's confidentiality agreement.

97.     Honeywell's interference with Mr. Montoney's confidentiality agreement was malicious and without privilege.  As detailed throughout this Complaint, Honeywell was motivated by an unlawful scheme to steal BRC's trade secrets, confidential information, and customers in a ploy to create a competing inspection compliance business based upon these ill-gotten gains.

98.     BRC has suffered damages as a result of Honeywell's tortious interference and seeks compensatory damages in an amount to be established at trial.

## COUNT IV
### Attorneys' Fees and Expenses of Litigation, O.C.G.A. § 13-6-11

99.     As alleged in Counts I-III of the Second Amended Complaint, Honeywell acted in bad faith when it intentionally scraped BRC's Customer List,

26

interfered with and damaged BRC's web site, and interfered with the confidentiality agreement between BRC and its former employee.

100.    Pursuant to O.C.G.A. § 13-6-11, BRC is entitled to recover its litigation expenses, including reasonable attorneys' fees, from Honeywell, with such amounts to be proven at trial.

**COUNT V**
**Punitive Damages, O.C.G.A. § 51-12-5.1**

101.    As alleged in Counts I-III of the Second Amended Complaint, Honeywell intentionally scraped BRC's Customer List, interfered with and damaged BRC's web site, and interfered with the confidentiality agreement between BRC and its former employee.

102.    These actions by Honeywell show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

103.    To punish, penalize and deter Honeywell, BRC is entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

**PRAYER FOR RELIEF**

**WHEREFORE**, BRC prays this Court grant the following relief:

(1)    Entry of judgment in BRC's favor on all counts.

(2)    Entry of judgment that Honeywell's conduct as alleged in this Complaint be found to have been willful.

(3)    For Count I, misappropriation of trade secrets:

    a.    Entry of a preliminary and permanent injunction enjoining Honeywell from using or disclosing BRC's confidential information and trade secrets;

    b.    Entry of a preliminary and permanent injunction ordering Honeywell to return to BRC all confidential information and trade secrets that it wrongfully downloaded or retained.

    c.    Compensatory damages in an amount to be determined at trial.

    d.    BRC be awarded exemplary damages and reasonable attorneys' fees, pursuant to O.C.G.A. §§ 10-1-763 and 10-1-764.

(4)    For Count II, Computer Trespass:

    a.    An award of direct and consequential damages including, but not limited to, reimbursement of the time and resources expended investigating Honeywell's trespass, and damages resulting from the disruption to BRC's web site, in an amount to be determined at trial.

    b.    An award of attorneys' fees and costs of this action.

(5)   For Count III, tortious interference with employment covenant:

    a.   An award of compensatory damages for losses resulting from Honeywell's tortious interference with BRC's employment covenant, in an amount to be proven at trial.

(6)   For Count IV, attorneys' fees:

    a.   An award of BRC's reasonable attorney's fees and expenses of litigation.

(7)   For Count V, punitive damages:

    a.   An award of punitive damages based on Honeywell's conduct which presumes a conscious indifference to consequences.

(8)   Any and other such further relief this Court deems equitable and just.

<u>JURY DEMAND</u>

BRC demands a trial by jury of all issues so triable.

Respectfully submitted this 29th day of June, 2018.

HILL, KERTSCHER & WHARTON, LLP

*/s/ Douglas R. Kertscher*
STEVEN G. HILL
Georgia State Bar No. 354658
DOUGLAS R. KERTSCHER
Georgia State Bar No. 416265
MARTHA L. DECKER
Georgia State Bar No. 420867

JENNIFER L. CALVERT
Georgia State Bar No. 587191
3350 Riverwood Parkway, Suite 800
Atlanta, GA 30339
Tel: (770) 953-0995
Facsimile: (770) 953-1358
E-mail:      sgh@hkw-law.com
             drk@hkw-law.com
             md@hkw-law.com
             jc@hkw-law.com

*Attorneys for Plaintiff*
*BuildingReports.com, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BUILDINGREPORTS.COM, INC., a
Georgia corporation;

                Plaintiff.

    v.

HONEYWELL INTERNATIONAL, INC.,
a Delaware corporation;

                Defendant.

**CASE NO. 1:17-cv-03140-SCJ**

**JURY TRIAL DEMANDED**

### CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing

**SECOND AMENDED COMPLAINT FOR DAMAGES** with the Clerk of Court

using the CM/ECF system which automatically sends email notification of such

filing to the attorneys of record, each of whom is a registered participant in the

Court's electronic notice and filing system.

           /s/ *Douglas R. Kertscher*
           DOUGLAS R. KERTSCHER
           Georgia State Bar No. 416265

           *Attorney for Plaintiff*
           *BuildingReports.com, Inc.*